UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, ex rel. )
 BENJAMIN TURNER )
  14 Rustwood Drive ) **FILED IN CAMERA AND UNDER**
  Barrington, RI 02806, )   **SEAL**
   )
and  )
  ) Civ. No. _____
THE GOVERNMENT OF THE DISTRICT OF )
COLUMBIA ex rel. BENJAMIN TURNER, )
   Plaintiffs )
  )
v.  )
  )
MAXIMUS  )
  Corporate Office - Reston )
  11419 Sunset Hills Road )
  Reston, VA 20190, )
   Defendant )

Serve:

The Honorable Roberto Gonzales,
Attorney General of the United States
10th and Constitution Avenue, N.W.
Room 4400
Washington, D.C.   20530

The Honorable Kenneth L. Wainstein
United States Attorney for
the District of Columbia
Judiciary Center Building
555 4th Street, N.W.
Washington, DC 20530

Service of Process Clerk,
Office of Corporation Counsel
The Government of the District of Columbia
Civil Division
441 4th Street, N.W. Suite 1060(N)
Washington, DC 20001

### CIVIL COMPLAINT

#### PURSUANT TO RULE 38, FEDERAL RULES OF CIVIL PROCEDURE, PLAINTIFF DEMANDS A TRIAL BY JURY

Plaintiff and Relator Benjamin Turner brings this action for

violation of 31 U.S.C. §§ 3729 et seq. for himself and on behalf

1

of the United States under the provisions of 31 U.S.C. §
3730(b)(1), and for himself and on behalf of the Government of
the District of Columbia, D.C. Act 12-374 of 1998, also known as
the "Procurement Reform Congressional Review Emergency Amendment
Act of 1998", codified at Title 2, Chapter 3, part c, §2-308 et
seq., and for himself under the Americans with Disabilities Act
and the Family Medical Leave Act of 1993, as Amended, all as
against Defendant MAXIMUS, as follows:

### NATURE OF THE CASE

1.   This case is brought for violations of the False Claims
Act, 31 U.S.C. § 3729(a) for false claims made through the
District of Columbia's Child and Family Services Agency ("CSFA"),
as to foster care children by Defendant MAXIMUS, a billing agent
for the CSFA from about 1999 through the present time.

2. Generally, the District of Columbia CFSA provides social
worker related and other health and welfare services for about
3,000 foster children at any one time, those children designated
as the wards of the District of Columbia.

3.   The District of Columbia CFSA is funded in part by  a
U.S. Title XIX (Medicaid) grant, entered into between the United
States and the District of Columbia, and funded in part by the
District of Columbia itself. The Federal Government pays, through
its Title XIX Medicaid grant with the District of Columbia, about
70% of the costs of care rendered to foster children by CFSA; the
District of Columbia pays about 30% of the costs of the care for
its wards.

4.   Generally, Defendant MAXIMUS entered into a contract

with the District of Columbia, which included services to CFSA
for the purpose of maximizing CFSA receivables. As part of its
contract, Defendant MAXIMUS also handled the billing for CFSA for
Medicaid services, including gathering data to support the
invoices, and actually submitting invoices to the United States
through its agents.

    5.  Upon information and belief, defendant MAXIMUS invoiced
the United States HHS, through its Medicaid grant, on behalf of
its customer CFSA, about $33,000,000, possibly much more, for
services over the time frame of this complaint. Relator had a
report run at MAXIMUS during the middle of the time frame of this
Complaint and discovered for this isolated time frame that only
22% of the records for CFSA wards indicated that payment was due.
For the 78% of the invoices, the services were either not
rendered, or no evidence existed to indicate that services
actually were rendered.

    6.  Defendant MAXIMUS invoiced CFSA 10% of all revenues
received by CFSA from the federal Medicaid fund that resulted
from Defendant's actions as a billing agent, as payment for
MAXIMUS's services to CFSA, believed to be in excess of
$3,300,000.

    7.  Plaintiff/Relator Ben Turner also alleges that MAXIMUS
caused Plaintiff to suffer extreme mental and physical distress
when he attempted to correct the invoicing catastrophe at
MAXIMUS, including removal from the work site, isolation from
employees, assignment to another supervisor, severe harassment,
and intimidation that became so severe and ruthless that

Plaintiff required medical intervention. While attempting to recover from his stress, MAXIMUS continued to harass Plaintiff by, for example, requiring him to work full time while he was on medical leave. Defendant MAXIMUS fired Plaintiff while he was on medical leave, causing additional harms.

8.   Plaintiff/Relator Ben Turner alleges that his employer MAXIMUS discriminated against Plaintiff in violation of the Federal False Claims Act ("FCA"), specifically under 31 U.S.C. §3730(h) of the FCA, and Section 816 of the "Procurement Reform Congressional Review Emergency Amendment Act of 1998", codified at Title 2, Chapter 3, part c, §2-308 et seq. ("the DC Act"), and violated the federal Americans with Disabilities Act ("ADA") and Family Medical Leave Act ("FMLA") in the process by it conduct.

## PARTIES

9. Plaintiff/Relator Benjamin Turner resides in Rhode Island, and worked for Defendant MAXIMUS, including visits and work out of the corporate office of Defendant in Reston, Virginia, in the Eastern District of Virginia, and in Washington, D.C., at the site of the .

10.   Defendant MAXIMUS is a business with its corporate headquarters located at 11419 Sunset Hills Road, Reston, Virginia, in the Eastern District of Virginia.

## JURISDICTION & VENUE

11. This action arises under 31 U.S.C. §§ 3729 et seq., the False Claims Act.

12.   Subject matter jurisdiction is conferred in this Court by 28 U.S.C. § 1331, because the action arises under the laws of

the United States, in particular 31 U.S.C. § 3729(a).

13. This Court has personal jurisdiction over Defendant under 31 U.S.C. 3732(a), because Defendant transacts or has transacted business in the District of Columbia, and holds a contract with an agency located in the District of Columbia, the District of Columbia's Child and Family Services Agency ("CSFA"). Invoices were sent demanding payment for services to the CSFA. Eastern District of Virginia, committed acts proscribed by 31 U.S.C. § 3729(a) within the Eastern District of Virginia, and Defendant MAXIMUS's headquarters are located in the Eastern District of Virginia.

Any action under §3730 of the FCA may be brought in any judicial district in which the defendant can be found, resides, transacts business, or in which any act proscribed by §3730 occurred, §3732(a), of the Act.

14. Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391(b), because the claims arise in the Eastern District of Virginia, and under 31 U.S.C. § 3732(a).

15. Pursuant to 31 U.S.C. §3732(b), claims brought under state law, "the district courts shall have jurisdiction over any action brought under the laws of any state for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence as an action brought under section 3730". The action brought in the name of the DC Act arises from the same transaction or occurrence the an action brought under section 3730 of the False Claims Act.

16. This action also is brought and jurisdiction lies

pursuant to Section 107(a) of the Americans with Disabilities Act, 42 U.S.C. §12117, (hereinafter "ADA") which incorporates by reference §706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-5, to remedy discrimination in employment on the basis of Plaintiff's disabilities, or perceived disabilities, or record of having a disability.

17.    All conditions precedent to jurisdiction under §706 of Title VII, 42 U.S.C. §2000e-5(f)(3), 42 U.S.C. §12117 and 42 U.S.C. §12203, and  have occurred or been complied with. Injunctive and declaratory relief, damages and other appropriate legal and equitable relief are sought pursuant to 42 U.S.C. § 2000e(f) and (g).

18.    Defendant MAXIMUS, Inc. Employs more than 5,000 persons, the jurisdictional minimum requires more than 15 full time employees for liability to attach under the ADA, and 75 persons under the FMLA.

19.    Plaintiff timely filed a Charge of Discrimination on the basis of disability with the Equal Employment Opportunity Commission ("EEOC") Charge No. 121-2003-00940 within 300 days of the unlawful employment practice alleged herein.

20.    A Notice of Right to Sue was signed and issued on July 30, 2003, and mailed soon thereafter, and was received on August 4, 2003.

21.    This complaint has been filed within 90 days of receipt of the EEOC's Notification of Right to Sue, that date being November 2, 2003. As November 2, 2003, is a Sunday, pursuant to Rule 6, Federal Rules of Civil Procedure, the next business day

that the Court is open, (November 3, 2003), satisfies this requirement.

22.  A copy of the Notice of Right to Sue is attached to this Complaint and made a part herein by reference as Exhibit A.

23.  As the unlawful employment practices complained of under the ADA herein occurred in Reston, Virginia, jurisdiction of the United States District Court for the Eastern District of Virginia, and venue are proper pursuant to §706(f)(3) of Title VII, 42 U.S.C. §2000e-5(f)(3). Declaratory relief, damages and other appropriate legal and equitable relief are sought pursuant to 42 U.S.C. § 2000e(f) and (g).

24.  This action is also brought for violations of the federal Family Medical Leave Act of 1993, as amended, 29 U.S.C. §2609, et seq. MAXIMUS employs more than 75 persons, and more than 50 in the Reston, Virginia area.  Plaintiff worked more than 1,280 hours in the preceding 12 months of his employment by Defendant.

## NATURE OF THE ACTION

### THE FEDERAL FALSE CLAIMS ACT

25.  This action is to recover damages and civil penalties arising from false statements or claims knowingly presented or caused to be presented by Defendant to the United States in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1), and because Defendant made, used, or caused to be made or used, false records or statements in order to obtain payment or approval from the United States in violation of 31 U.S.C. § 3729(a)(2).

26.  The violations of the False Claims Act ("FCA") arise

because Defendant submitted and/or participated in the submission of false claims to the United States Government in connection with the performance of services for Medicaid child beneficiaries placed for foster care services in the District of Columbia, such children being wards of the guardian, the District of Columbia, and such Medicaid-covered services to be performed by CFSA. Defendant, as billing agent for CFSA, knowingly submitted or caused to be submitted invoices to the United States Government demanding payment for claims based on what it knew, or but for its reckless disregard or deliberate ignorance of the true facts, would have known, were false data and untenable false claims because it was in charge of invoicing for social worker services and other services performed by CFSA.

27. Defendant knew that, through its own management of data collection in connection with invoicing CMS for services, and through its data collection services, that it invoiced for services that were not performed, or for which no documentation to show any such services were performed. In some instances MAXIMUS, in addition to resorting to a computer system that was to be used by social workers, in the absence of any data, also knew from direct contact and interviews with documentation surveys with CFSA social workers and others, that CFSA employees affirmatively did not perform many of the services. After obtaining confirmation that such services were not performed through a CFSA computer search, and in the majority of instances after contacting the social workers who confirmed the services were not performed, MAXIMUS nevertheless created files that

indicated services were performed, and used such information to demand Medicaid pay for services not rendered. The United States, unaware that such services were not rendered, paid the claims.        28.  CFSA, unaware that MAXIMUS was billing for social worker and other services Defendant knew were not rendered, and often actually documented not rendered, and in other instances in the complete absence of documentation, received funds from the United States to which it was not entitled. CFSA was not permitted under federal laws and regulations to invoice for services not rendered. Upon information and belief, CFSA was not ever fully informed of the actions of Defendant MAXIMUS in this regard. Upon information and belief, the U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services ("CMS") was also not notified by MAXIMUS of the  false invoicing and/or the huge extent of it.

29.  The False Claims Act provides that any person that knowingly or with deliberate ignorance or reckless disregard of the truth, submits a false or fraudulent claim to the United States for payment or approval, is liable for a civil penalty of not less than Five Thousand Dollars ($5,000.00) and not more than Ten Thousand Dollars ($10,000.00) up to September 30, 1999, and after September 30, 1999, not less than Eleven Thousand Dollars ($11,000.00) for each such claim, plus three (3) times the amount of damages sustained by the Government because of the false claim.  The FCA allows any person having knowledge of a false or fraudulent claim against the Government to bring an action in

federal district court on behalf of the United States, and to share in any recovery pursuant to §3730(b), the False Claims Act.

30. Based on these provisions, Relator seeks through this action to recover damages and civil penalties arising from false and any misleading statements contained in records, invoice preparation documents and files in the exclusive control of Defendant, and in the actual invoices themselves, including adjustments, and credits and all other manner of reports, no matter what description, made or submitted by or caused to be made or submitted by Defendant to the United States Government in connection with work performed for the United States Government pursuant to federally funded health care programs, namely Medicaid beneficiary claims on behalf of CFSA.

31. Relator has original, direct and independent knowledge of Defendant' s violations of the FCA and other statutory violations and voluntarily provides to the United States Government information on which the allegations set forth in the Complaint are based.

FALSE CLAIMS TO THE GOVERNMENT OF THE DISTRICT OF COLUMBIA

32. In 1998, the District of Columbia enacted its own version of the Federal FCA, D.C. Act 12-374 of 1998, also known as the "Procurement Reform Congressional Review Emergency Amendment Act of 1998", codified at Title 2, Chapter 3, part c, §2-308 et seq. The Act amended Section 2 of the District of Columbia Procurement Practices Act of 1985, effective February 21, 1986 (D.C. Law 6-85; D.C. Code §1-1181.1 et seq., amended Section 104(c), 105, 107, (§2-308 et seq. ("the DC Act") to

essentially track the FCA, to permit private persons to bring
such actions on behalf of the District of Columbia and to share
in the recovery of any funds that result from that person's
action, and to provide for similar penalties for fraud committed
by contractors working for the District of Columbia and its
agencies against the District of Columbia or its agencies.

33.  The DC Act provides that any person who (1) knowingly
presents, or causes to be presented, to an officer or employee of
the District a false claim for payment or approval; or (2) who
knowingly makes, uses, or causes to be made or used, a false
record or statement to get a claim paid or approved by the
District, or (3) who is a beneficiary of an inadvertent
submission of a false claim to the District, subsequently
discovers the falsity of the claim, and fails to disclose the
false claims to the District, or (4) is the beneficiary of an
inadvertent payment or overpayment by the District of monies not
due and knowingly fails to repay the inadvertent payment or
overpayment to the District is liable to the District for 3 times
the amount of damages which the District sustains because of the
act of that person.  A person who commits any of the acts is also
liable for a civil penalty of not less than $5,000, and not more
than $10,000 for each false claim submitted by that person.
Section 814, the DC Act.

34.  CFSA, as an agency or agent of the District, had a
contract or contracts with Defendant MAXIMUS, and agreed to pay
MAXIMUS 10% of any monies received from the U.S. Government for
services rendered to Medicaid eligible foster care children, from

Medicaid.

35.   In about May of 1999, CFSA contracted with Defendant
MAXIMUS to act as a billing agent and to invoice the United
States for services rendered by CFSA to Medicaid beneficiaries.

36. As payment for the services MAXIMUS was to perform,
namely to collect data from the FACESS computer system used by
CFSA to bill, and to perform other services including preparing
data to invoice the United States for Medicaid beneficiaries,
CFSA agreed to pay Defendant MAXIMUS 10% of all revenues received
from Medicaid because of invoices prepared and sent by MAXIMUS to
Medicaid.

37.   CFSA has been severely harmed from the conduct of
MAXIMUS.   First, MAXIMUS invoiced CFSA for 10% of all funds
received from Medicaid funds that resulted from MAXIMUS's
billings.

38.   Second, CFSA, and to an extent not known by Relator,
the District, not knowing that many millions in Medicaid funds
were illegally obtained through the fraudulent misconduct of its
contractor MAXIMUS, used Medicaid funds to expand its service
capacity for foster children, and to adjust the CFSA and District
to allocate costs and revenues in the future.   Upon information
and belief, CFSA and the District were unaware that the Medicaid
funds were not obtained legally and according to law.   CFSA, and
to an unknown extent the District as a whole, is in no position
to recoup funds expended by CFSA or the District to hire and pay
employees, to provide improved services to the poor including the
foster children assigned to the care of CFSA, and for other

services used to care for residents of the District.

39. Third, in reliance on the misrepresentations and actual false billing by Defendant MAXIMUS, CFSA and to an unknown extent the District as a whole, is in no position to repay the Federal Government for Medicaid funds obtained through the actions of Defendant MAXIMUS. CFSA, by virtue of the acts of MAXIMUS, has been damaged to the extent that it cannot recover for its losses that were a consequence of MAXIMUS's false billings. Should the United States demand repayment by the District of Columbia under any theory of unjust enrichment or other causes of action, the harm will fall to the taxpayers of the District, or to the Federal Government.

40. Relator has original, direct and independent knowledge of Defendant's statutory violations of the DC Act and voluntarily provides to the District information on which the allegations set forth in the Complaint as to the District are based.

## ALLEGATIONS

41. Plaintiff Ben Turner was hired by MAXIMUS on March 1, 1999, as a Director in the Human Services Division. Defendant MAXIMUS terminated Plaintiff's employment in June, 2002. Prior to his employment at MAXIMUS, Mr. Turner worked as a management consultant at the Institute for Health and Human Services, Inc., Saratoga Springs, New York for approximately eleven (11) years.

42. Defendant MAXIMUS is a large, 5,000 employee company, engaged in such endeavors as payment processing, providing eligibility determinations for Medicaid and the federal State Children's Health Insurance Program ("SCHIP") for states such as

Michigan and Kansas, state child welfare program management services, federal government contracting to a number of federal agencies and Departments, is a billing company which invoices the United States for services provided to or on behalf of Medicaid federal health care beneficiaries by CFSA.

43.   Defendant MAXIMUS trains its employees in the requirements of Medicaid billing, and advertises that the Child Welfare Division of MAXIMUS assists integrating information systems that support these services.  MAXIMUS advertises on its web site that it "help State, County, and not-for-profit agencies improve their compliance with federal laws and regulations... Emphasis is placed on preparation for passing federal reviews and audits, on improving basic service delivery operations procedures..."

44.   It is not known to Plaintiff if MAXIMUS has a regulatory compliance officer.  If there is such a position at MAXIMUS, Plaintiff was never so informed.

45.   In the approximate mid to late 1990s, efforts were made by federal contractors to convince the District that it should use a billing agent for the District of Columbia Medical Assistance Program, particularly in regards to its Child and Family Services Agency (CFSA).  The District provided Medicaid services through CFSA for Medicaid children in foster care, CFSA using Medicaid Provider Number 4419930.

46.   In July of 1999, the U.S. Health Care Financing Administration ("HCFA", and predecessor to "CMS"), entered into a new State Plan Under Title XIX of the Social Security Act with

the District of Columbia, pursuant to Section 1915(g)(1) of Title XIX of the Social Security Act (Medicaid)("State Plan"), in essence a case management plan for abused or neglected children. The services the District was to provide were to assist children in the target group in accessing needed medical, social, educational, and other services appropriate to the needs of the individual child.  This service is generally referred to as "Targeted Case Management" services, or "TCM".

47.   The State Plan defines those who are eligible for such services.  The State plan considers TCM to include all children that are foster children, and wards of the District of Columbia that are at risk of abuse or neglect "or abused and neglected children who are in the care of CFSA."

48.   The State Plan defined the services to be performed (client intake, assessment, case planning, service coordination and monitoring, and case plan reassessment.  Section F. of the State Plan.

49.   The State Plan sets forth a formula for TCM payments, consisting generally of actual costs incurred by CFSA multiplied by the various factors.  The average monthly cost of Medicaid TCM management services is divided by the number of clients in receipt of Medicaid services during the month creates a monthly cost per Medicaid eligible child.  For each child who received TCM services, CFSA may invoice HCFA for services.  A uniform rate per child, then, is used for invoicing.

50.   At about this time, MAXIMUS, as a subcontractor to a small minority owned business in the District of Columbia,

contracted with the District/CFSA to provide "consulting"
services, including processing and submitting invoices to
Medicaid on behalf of CFSA.  The contract is termed the "Revenue
Maximization Contract" ("RMC").  Upon information and belief, this
contract was one of several contracts entered into between
MAXIMUS and the District for revenue enhancing services, under
the umbrella of a master contract.  There were many management
engagement letters and other agreements that are related to this
master contract and the RMC contract.  The RMC contract was to
last three years.  MAXIMUS was to go back in time to the extent
permitted by HCFA and make claims for services rendered but not
billed to Medicaid.  MAXIMUS was also to provide assistance in
getting the data into the FACES system such that it was a
reliable tool for invoicing and tracking of CFSA children.

51.  In early 2000, CFSA had about 3,000 children enrolled
at the time, some in foster homes in Virginia, Maryland and the
District of Columbia, others in group homes or elsewhere.

52.  Generally, the District's CFSA had implemented a
paperless records program for TCM services, wherein CFSA social
workers and others would enter data into their laptops or into
the system at work noting the TCM services they rendered to any
particular child.  The computer program was referred to as the
"FACES" program, this term not acronymic of any set of words.

53.  Some of the CFSA social workers were used to the old
paper filing system, and were reluctant to used the FACES
program, the program was in many respects not user-friendly.

54.  Plaintiff was hired to be a Director in the Human

Services Division to start on March 1, 1999. His assignment initially was to dedicate his full attention to the RMC contract with CFSA and work directly with the CFSA staff and MAXIMUS employees to implement the revenue maximization program. Plaintiff worked at the CFSA site, in the field, and in MAXIMUS corporate headquarters, and occasionally at the McLean Virginia MAXIMUS invoicing site.

55.    Plaintiff reported to Greg Holland at MAXIMUS. Mr. Holland did not go to the CFSA offices except on occasion. Mr. Holland reported to then Senior Vice President of Human Services Division Robert Fallon.

56.    The RMS contract called generally for services rendered two years retroactively and three years prospectively. The first order of business was to access the FACES system and ascertain the efficacy of that system.

57.    Over time, Plaintiff learned that some of the social workers were not entering any information into the computers for children assigned to their case load, but instead continued to keep a paper file. One of the first orders of business was to attempt to get the social workers and other CFSA employees familiar with the FACES system, and to use the system rather than paper files, as the paper file data was not obtainable for billing purposes any longer. Deloite and Touche were also provided training services to CFSA for the FACES program.

58.    CFSA social workers were to use the FACES system rather than continue to use paper files for present work. Some did, some did not.

59.  Over time, several months, it became obvious to Plaintiff that in order for the invoicing to occur, the data in the paper files was critical.

60.  While working at the CFSA office, Plaintiff learned among many things that:

A.  CFSA was overwhelmed with work, and the files of children coming into the system or to be assigned to a different social worker due to social worker turnover would sit for months, untouched, in office cubicles.  These foster children were not receiving any services at all.  Plaintiff saw hundreds of such files over a period of about one year.

B.  Social workers continued to use paper files rather than the FACES system.  In other words, FACES was used minimally.

C.  When talking to social workers, Plaintiff and others were told that the case load was so high that many services were not performed.

D.  Throughout 2000 and beyond, CFSA and its manager Brenda Sleigh tried to make the system work.  Ms. Sleigh insisted that there were programming problems, what Plaintiff saw was a huge lack of TCM services performed.  CFSA claimed the problems were because of the "transition" to a paperless system.

61. Also in July of 1999, Plaintiff took Kevin G. Norris, a vice president and TCM expert from MAXIMUS who did consulting on projects, to the CFSA building to spend the day working with the data and talking to social workers and CFSA management.

62.  As Plaintiff and Mr. Norris were leaving the building, walking out of the door on H Street, it was getting dark and they

were waiting to hail a cab.

63.  Norris turned to Plaintiff and remarked, "Not a lot of data in there", with a grim look.

64.  Plaintiff responded, "What to do?"

65.  Norris replied, "Claim them all".

66.  Shocked, Plaintiff said, "Says who?"

67.  Norris responded, "Says Bob", meaning Robert Fallon, the Senior Vice President.

68.  Plaintiff began to suffer from general stress and anxiety because of the seemingly impossible situation.    62. Over time, Plaintiff discussed these mounting problems in collecting past data for invoicing with MAXIMUS management, most often with Mr. Holland.  There was little response except a retort that MAXIMUS would not be paid unless and until invoices went out.

69.  Plaintiff saw the data in the FACES system for thousands of children over time, including printouts. Most of the files were missing large amounts of data.

70.  As the FACES system continued to fail for the reasons cited above in this Complaint and possibly for other reasons as well, Plaintiff became concerned that the FACES system would not ever be brought up to speed for past services rendered, particularly since many case workers had left CFSA, CFSA had many children not assigned to a case worker, and a few CFSA case workers ignored the requirement that data for TCM services be entered into the FACES computer program.

71.  Plaintiff persuaded Mr. Holland to visit the CFSA

facility with him for a full day in October of 1999. Plaintiff
and Mr. Holland spent their full time and attention to the matter
of how much data was in the FACES system that could be used for
invoicing, and what data was in the paper folders some CFSA
social workers continued to use. At the time, it looked to
Plaintiff as if over 80% of all children did not have entries, or
had major gaps, in services, both in the FACES system and in
paper files. Holland viewed the same information often side by
side with Plaintiff.

72. At that time, MAXIMUS was still completely unable to
invoice Medicaid for services: CFSA was working on a shoe-string,
MAXIMUS was not being paid.

73. Robert Fallon had made about two visits to the CFSA
building, always in the presence of Plaintiff at the time, but
Mr. Fallon would not look at the case files.

74. Plaintiff suggested to several MAXIMUS employees that
something be done on an emergency basis to correct the situation.
Fearful that invoicing would go out to Medicaid demanding payment
for services not rendered, Plaintiff pleaded for help in various
ways.

75. Vice President Bob Fallon did not speak to Plaintiff
about his difficulties, and did not go to the FCSA office to
observe or talk to the employees of CFSA about the difficulties
Plaintiff had reported to his supervisor Greg Holland.

76. The response of MAXIMUS was to ship Plaintiff off to
other projects in different states for a number of weeks,
separating him from CFSA and the RMC contract.

77.  A few months later, in about December of 2000, Plaintiff was again assigned to the CFSA/RMC contract.  While he was gone, MAXIMUS had placed a junior manager onto the project. MAXIMUS hired about 25 temporary employees from a temporary service.  These individuals had been plugging in the information from the paper folders some of the social workers were still using.  The project was referred to as "Operation Lightning Rod". Anna Mosby replaced Plaintiff for the period that "Operation Lightning Rod", which lasted from about the end of January 2001 through June of 2001, was in place, preventing Plaintiff from access to some information.

78.  These temporary employees were also interviewing CFSA social workers, trying to collect past information that may not have been recorded.  Information gathering sheets were filled out.  Plaintiff saw many of these data sheets, which frequently indicated that services were not performed, and that what was in the FACES computer or from the old paper files were all the services rendered.  Plaintiff talked to CFSA social workers, who readily admitted that visitations and other TCM services were not performed.  Plaintiff reviewed hundreds of the information sheets, and saw that virtually none of the gaps in data related to services that were not recorded as performed in the FACES sytems were truly not performed.

79.  The FACES program continued to show a huge deficiency in data, estimated to be in excess of 80% of data missing.

80.  Plaintiff's health continued to be impacted by stress over the situation.  Plaintiff was admonished to make the system

work, yet the data simply, in most cases, did not exist.

81.  Eventually in July or August of 2000, the first invoice for services on behalf of CFSA was generated, a claim of nearly $13 million dollars.  Plaintiff was shocked at the large amount of revenue demanded for past work.

82.  Plaintiff had occasion to go to the McLean, Virginia billing office.  While he was there, he encountered Kevin Norris.

83.  Plaintiff brought up the matter of such a large services invoice going to HCFA for past services performed by CFSA.  Norris explained that the invoices were not based on the CFSA data base, but instead MAXIMUS had taken Plaintiff's early suggestion that, as a start, to find missing children, or to compare children's names that may be serviced by other District programs, that the original court records be used to enter the basic data for each ward.

84.  MAXIMUS had sent the CFSA data to FirstHealth, the agent for HCFA for Medicaid billing. FirstHealth would send the data to a firm in Virginia that would create an interFACES or converted the FACES program data into a program that would allow for invoicing.  FirstHealth produced a record of services rendered for CFSA children electronically and in another format.

85.  FirstHealth then returned the information electronically to MAXIMUS' invoicing center.

86.  The electronic form of the data was then manipulated by MAXIMUS.  First, several checks and balances were in place in the FirstHealth version of data.  MAXIMUS would instruct the program to ignore fields where services were blank or zero, an override

so to speak, such that the program would generate an invoice even though no services were rendered.    In other words, when data would not match up from the FACES system, one would have to hit 50 or so items before the invoice could go through. To evade this situation, MAXIMUS would turn off the edits for data so that all bills would go through regardless of the lack of data.

87.    MAXIMUS was using the court system records, and as long as that information was entered into the FACES program, MAXIMUS would generate a bill for services even though there was no record of services performed.    MAXIMUS would get the Medicaid number and name of each child from the court records, match the names to the Medicaid file, and invoice from there.    The documents used and the computer programs used, as well as other materials, are in the exclusive possession and control of MAXIMUS.

88.    At the conclusion of "Operation Lightning Rod", Plaintiff requested MAXIMUS provide him with a computer generated report of TCM services rendered, nearly one year after the first, $13 million invoice, was generated.    That report showed that only 22% of the foster children for whom TCM had been invoiced had actually received a TCM service.    The remaining 78% of the children, listed by name on the report, had had no services rendered, in other words there was no data match for these children.    By that time, approximately $25,000,000 had been invoiced to Medicare.    When Plaintiff got the report, he had a conference call with Greg Holland and James Strayney, Head of Systems Operations, notifying them of the massive lack of data to

support the majority of invoices sent out.

89.  Defendant MAXIMUS did make note of when a child was listed on two District programs, and ran an adjustment, a very small percentage of children, mostly for duplications with the Medicaid partially funded federal "E4" Program that many foster children are initially beneficiaries of.  92% of the children that were picked up from the court system records were invoiced by MAXIMUS for Medicaid services.

90.  The first invoice was signed by Greg Holland, Plaintiff's boss, on behalf of Lynn Davenport, President of the Human Services Division and boss of Robert Fallon.

91.  The invoice to the District of Columbia for the 10% of revenue to CFSA was dated October 10, 2000, demanding $654,864.00 of CFSA for services rendered.  Upon information and belief, CFSA paid that invoice, and several thereafter, generated monthly, for services claimed rendered, the invoices based on court records of the existence of children to be assigned to CFSA, and not upon the business records of CFSA for services rendered by its social workers and others.

92.  Plaintiff expressed his concerns to key employees of MAXIMUS.  One comment Plaintiff recalls is from Milton Grady, now a former employee, who knew all about the debacle of using court records of assignments of children to get the children on the CFSA FACES system if not otherwise there, and to invoice Medicaid thereafter for services not recorded as rendered.  He called the invoicing system and what had occurred thus far a "house of cards".  This comment was prior to Plaintiff's discovery of the

true extent of the fraud. It is improbable that Mr. Grady had been informed of the true scope of the misbilling.

93. Over time, Plaintiff's stress had worsened considerably. In December, 2000, prior to returning to "Operation Lightning Rod" Plaintiff advised MAXIMUS that he suffered from Attention Deficit Hyperactivity Disorder ("ADHD"). Specifically, Mr. Turner sent e-mail to his division vice president, Bob Fallon, informing him of his ADHD and his intention to seek treatment. Subsequently, he informed Mr. Fallon of his need to take psychotropic medication. Thereafter, Mr. Fallon made repeated and inappropriate inquiries regarding Plaintiff's psychiatric condition. Plaintiff also discussed his mental impairments and treatment with his direct supervisor, Greg Holland.

94. Upon learning of Plaintiff's disabilities, MAXIMUS subjected Plaintiff to increased harassment. In January, 2001, at a Human Services Division off-site meeting in Tampa, FL, Mr. Fallon advised Plaintiff that certain events would occur "once he gets himself [his mental health] straightened out."

95. In or about Spring/Summer, 2001, Plaintiff's disability worsened and he began experiencing symptoms of depression and anxiety. He was thereafter additionally diagnosed with Major Depression and Panic Disorder, attendant to ADHD. Following September 11, 2001, the Claimant's symptoms worsened to the point where he could no longer fly on a plane and began driving each week from Washington, DC to his home in Rhode Island.

96. Plaintiff continued to work on this CFSA project off

and on. In December, 2001, Plaintiff advised Mr. Holland that he planned to begin flying again after the New Year. Mr. Holland responded that that was good because Plaintiff's condition was a topic of conversation at vice president meetings.

97. Plaintiff continued to keep in touch with the personnel at CFSA, and the even greater problem regarding the false billing of HCFA for Medicaid funds dating back to early 1999. Plaintiff was loathe to get involved in any of the invoicing aspects of the business of MAXIMUS, and had no control over the invoicing actions of his superiors.

98. Plaintiff's investigation of the billing process did not go unnoticed. Plaintiff revealed the extent of the fraud to his supervisors and others. Plaintiff reported the facts to the new Chief Financial Officer in December of 2001. First, Kevin Norris works for Robert Fallon, and takes his direction from Fallon. Upon information and belief, Kevin Norris also would have informed Fallon that Plaintiff was aware of the problems, as that was Mr. Norris's job. Mr. Norris was made aware of the problems by working side by side with Plaintiff and by access to the invoicing system at MAXIMUS. Barry Bodell, a MAXIMUS employee and Director of Human Services once remarked to Plaintiff when plantiff he was explaining his findings, responded with words to the effect that MAXIMUS' bills were "only 75% fraudulent."

99. On March 4, 2002, Plaintiff informed Jeannette Zuares, MAXIMUS's Human Resource representative, that he required a medical leave of absence and requested the necessary paperwork.

On March 4, 2002, while at work, Mr. Turner experienced a panic attack while at work at CFSA, his assigned contract site.

100.   On March 5, 2002, Plaintiff was at work at the Reston, Virginia corporate headquarters of MAXIMUS. The head of the CFSA office ordered not to "dare" to CFSA the following day.

101. On March 5, 2002, Plaintiff met with Ms. Zuares and explained that he was suffering from ADHD, depression and anxiety and that due to his symptoms, he required a medical leave of absence. Ms. Zuares informed Plaintiff that in order to be allowed the medical leave, Mr. Holland would need to sign the medical leave paperwork. On March 7, 2002, Plaintiff met with Mr. Holland and advised him that he required a medical leave of absence due to his mental impairments.

102.   Mr. Holland informed Plaintiff that Mr. Fallon wanted him to fire Plaintiff. Mr. Holland further stated, "[t]hey can't fire you. You're sick and you need medical help." On March 18, 2002, Plaintiff began his approved medical leave of absence.

103. Despite the fact that MAXIMUS approved a twelve week medical leave of absence to June 7, 2002, Plaintiff was required to actively work from home. Plaintiff received frequent telephone calls, was required to participate in numerous conference calls, frequently sent and received files and other work-related information and continuously corresponded with MAXIMUS employees via e-mail.

104.   On or about April 17, 2002, four-weeks into Plaintiff's absence from work, Plaintiff's spouse Lynne Turner contacted MAXIMUS to advise them that Plaintiff was not being

given leave but was, instead, being forced to work from home.
Mrs. Turner further advised MAXIMUS that the failure to allow
Plaintiff Turner to take his statutory leave was compromising his
health and impairing his ability to recover.  Four weeks after
Plaintiff's approved medical leave of absence should have begun,
MAXIMUS allowed Plaintiff to actually commence a medical leave of
absence.

105. Even after April 17, 2002, Plaintiff received telephone
calls from MAXIMUS and was required to perform work for MAXIMUS.
Specifically, in late May, 2002, Plaintiff was called at home and
requested to review work that was performed in his absence as
well as to participate in a conference call with a client on May
30, 2002.

106.  On June 7, 2002, Plaintiff called Ms. Zuares to
request an six more weeks of medical leave.  Ms. Zuares required
Plaintiff to contact Mr. Holland or the Division Vice President
to request additional leave.  On June 10, 2002, Mr. Holland
called Plaintiff and stated that he had forwarded his request to
Mr. Fallon and Gary Kaiser-Sheely, Division Vice President and
that they would decide whether or not to grant Plaintiff's
request for additional leave.  Thereafter, MAXIMUS again began
requiring Plaintiff to resume work from home.

107. Plaintiff never received a response to his request for
additional leave.  Instead, on Saturday, June 22, 2002, Plaintiff
received a letter from Beverly Swann, Vice President of Human
Resources, stating that his employment at MAXIMUS was terminated,
effective June 21, 2002.  The letter stated that "MAXIMUS is not

in a position to grant this request [for an extension] and must inform you that your employment with MAXIMUS terminates effective June 21, 2002."

108. In addition to loss of income due to MAXIMUS's discriminatory acts and/or omissions, Plaintiff has suffered severe emotional harm. Plaintiff has been and continues to be under the care of Timothy Rivinus, M.D., Ted Chapman, M.D. and Charles Folkers, Ph.D. for stress related illnesses. Plaintiff continues to require therapy as well as psychotropic medication and has been diagnosed as suffering from increased depression and anxiety caused by the unlawful treatment by MAXIMUS.

109. Throughout his employment, Plaintiff was a hard-working and loyal employee of MAXIMUS. His job performance was exemplary, as evidenced by annual salary increases, letters of commendation, regular and supplemental bonuses. There is no record of any disciplinary action taken against Plaintiff throughout the entire course of his employment at MAXIMUS.

110. Plaintiff discussed his concerns about the mischarging for services not performed to several persons over a period of years at MAXIMUS. It was more than evident that Plaintiff possessed considerable knowledge of the fraud, and was opposed to the fraud.                    COUNT I

### FALSE CLAIMS ACT VIOLATIONS BY DEFENDANT MAXIMUS

1-110. Plaintiff repeats and realleges each and every allegation in paragraphs numbered "1" through "110" of this Complaint with the same force and effect as if fully set forth herein.

111. At all times pertinent to this Complaint, Defendant MAXIMUS's employees were acting within the scope of employment.

112. From July of 1999 and continuing, as a contractor for CFSA Defendant MAXIMUS's employees were or are responsible for the performance and completion of invoicing and records services in compliance with the federal service provider application forms, HCFA 855/CMS 855, or other application form executed by agents of the District of Columbia, the terms of the federal Medicaid Grant application and agreements with the District, and the federal provider agreements for services with the District or its agencies, and other contracts, laws, and regulations arising from Title XIX of the Social Security Act and other federal laws, for Medicaid service providers.

113. From July of 1999 and continuing, Defendant MAXIMUS, as Medicaid billing agent and contractor for CFSA, knew that Medicaid services were not performed by CFSA, and invoiced for services claimed provided to Medicaid beneficiaries by CFSA that in fact were not performed by CFSA, as if the Medicaid services were in fact performed.

114. From July of 1999 and continuing, Defendant MAXIMUS, as billing agent and contractor for CFSA, knew that there was zero documentation that services were performed, that the lack of records by CFSA social workers indicated that in all likelihood services were not performed by CFSA social workers, for up to over 70%, in Relator's best estimation, of invoices created on behalf of CFSA and used to demand payment from the United States for Medicaid services. Defendant MAXIMUS invoiced for services

for which there was no evidence such services were performed,
even after exhaustive FACES to FACES interviews with CFSA social
workers and others.

115.   Federal Medicaid law requires that no invoices may be
sent demanding payment for services rendered without a record of
such services having been performed, properly signed by the
provider rendering such services.

116.   Federal Medicaid law requires that no services may be
invoiced unless and until records of services are in compliance
with Medicaid law and regulations.   Under Federal Medicaid law,
no provider may invoice for services in advance of having
recorded and made true, accurate, and complete records of
services performed.

117.   The District of Columbia, and its agencies, as a
provider of Medicaid services, is required to adhere to Medicaid
law as a condition of its provider agreement with Medicaid and a
recipient of federal Medicaid funds through the Medicaid state
grant program.

118.   Contractors and subcontractors of providers rendering
services to Medicaid providers, including billing agent services,
are legally and contractually bound to comply with the same
Federal statutes and regulations, and the provider agreements, as
that of the provider.

119.   Defendant MAXIMUS, as a contractor of services to
Medicaid provider CFSA, provided billing agent services, and is
legally and contractually bound to comply with the same federal
statutes and regulations, and provider agreements, as that of

provider CFSA.

120. By federal law, invoices and demands for payment from Medicaid by Medicaid providers must be based upon the books and records of the provider, available for auditors and in accordance with record keeping regulations.

121. Upon information and belief, Defendant MAXIMUS did not use the records and books of CFSA for most of its invoices to Medicaid. Instead, Defendant MAXIMUS invoiced for services that were not recorded as having been performed in the books and records of CFSA, and instead created billing documents that represented that the work was performed and that records existed.

122. CFSA, as a Medicaid provider, is a contractor for Medicaid services, and receives a portion of its funding, approximately 70%, from a Medicaid Grant between the United States and the District of Columbia.

123. By the above acts, Defendant MAXIMUS, as billing agent for CFSA, knowingly presented or caused to be presented false claims to the United States Government in violation of Section 3729(a)(1) of the False Claims Act.

124. By the above acts, Defendant MAXIMUS made, used, or caused to be made or used false statements or records to get claims paid or approved by the United States Government in violation of Section 3729(a)(2) of the False Claims Act.

125. The United States Government, through it contractors and agents, unaware of the falsity of the claims for payment and statements made or authorized by Defendant MAXIMUS in support of those claims for payment, paid claims for payment that were

grounded in fraud.

126. The United States Government has been damaged in an amount yet to be determined as a direct result of the conduct of Defendant MAXIMUS, but believed to be approximately $33,000,000.

127. The United States Government will continue to be harmed by Defendant MAXIMUS unless and until this Honorable Court grants relief.

### COUNT II

### VIOLATIONS OF "THE DC ACT" BY DEFENDANT MAXIMUS

1-127. Plaintiff repeats and realleges each and every allegation in paragraphs numbered "1" through "127" of this Complaint with the same force and effect as if fully set forth herein.

128. At all times pertinent to this Complaint, Defendant MAXIMUS employees were acting within the scope of employment.

129. From July of 1999 and continuing, Defendant MAXIMUS employees were or are responsible for the performance and completion of services in compliance with its contract for billing and records services for the District's CFSA. Defendant MAXIMUS was on notice that it was to comply with all statutes, regulations, contracts and other agreements between itself and CFSA or the District, and between the District and the federal government as a provider of Medicaid services, including receipt of Medicaid grant funds, including laws, and regulations arising from Title XIX of the Social Security Act, for Medicaid services to be performed by CFSA, as a Medicaid provider.

130. Under the DC Act, "claim" includes or means any request

or demand for money made to any employee, officer, or agent of
the District, or to any contractor, grantee, or other recipient,
whether under contract or not, if any portion of the money
requested or demanded issued from, or was provided by, the
District, or if the District will reimburse such contractor or
other recipient for any portion of the money or property which is
requested or demanded.  Section 813, Definitions, of the DC Act.

131. The DC Act provides that any person who (1) knowingly
presents, or causes to be presented, to an officer or employee of
the District a false claim for payment or approval; or (2) who
knowingly makes, uses, or causes to be made or used, a false
record or statement to get a claim paid or approved by the
District, or (3) who is a beneficiary of an inadvertent
submission of a false claim to the District, subsequently
discovers the falsity of the claim, and fails to disclose the
false claims to the District, or (4) is the beneficiary of an
inadvertent payment or overpayment by the District of monies not
due and knowingly fails to repay the inadvertent payment or
overpayment to the District is liable to the District.

132. From July of 1999 and continuing, Defendant MAXIMUS
provided billing agent and record keeping assistance to CFSA.

133.  From July of 1999 and continuing, Defendant MAXIMUS
invoiced CFSA for work that was not performed, work that was
defectively performed, and for work that was not in compliance
with federal statutes and regulations regarding the invoicing of
Medicaid for provider services.

134. Defendant MAXIMUS knew that it was required to use the

books and records of CFSA to invoice the United States for
Medicaid services.

135.  Defendant MAXIMUS had liberal access to the books and
records of CFSA, conducted interviews and filled out information
sheets to capture and record those entries which were not located
on the CFSA's computerized record tracking system, initially, and
placed it on the FACES system.

136.  Defendant MAXIMUS, used the CFSA books and records,
and supplemental interview information to create an interFACES
between the computer system in place (FACES) at CFSA, and a
computer owned and controlled by MAXIMUS.

137.  Defendant MAXIMUS, would conduct an initial computer
run or create an initial report using the data and information
collected from the CFSA FACES system.

138.  Defendant MAXIMUS employees were instructed to
eliminate checks and edit fields into the computer system that
would prevent an invoice from generation if there were no
services rendered for a beneficiary.  Rather, as along as MAXIMUS
had a name of a Medicaid beneficiary foster child's existence
information (name, social security number, address, etc., but not
service information), obtained from another report other than
service information, MAXIMUS would create an invoice for that
beneficiary, as if services were performed, when there was no
record of such services having been performed.

139.  By the above acts, Defendant MAXIMUS knowingly
presented or caused to be presented false claims to the District,
in violation of Section 814(a)(1) of The DC Act.

140. By the above acts, Defendant MAXIMUS made, used, or caused to be made or used false statements or records to get a claim paid or approved by the District in violation of Section 814(a)(2) of the DC Act.

141. By the above acts, Defendant MAXIMUS is a beneficiary of an inadvertent submission of a false claim to the District, subsequently discovered the falsity of the claims, and failed to disclose the false claim to the District, in violation of Section 814(a)(8) of the DC Act.

142. By the above acts, Defendant MAXIMUS is a beneficiary of an inadvertent payment or overpayment by the District of monies not due and knowingly failed to repay the inadvertent payment or overpayment to the District, in violation of Section 814(a)(9) of the DC Act.

143. The District, unaware of the falsity of the claims and statements made or authorized by Defendant MAXIMUS, paid claims for payment to MAXIMUS that were grounded in fraud.

144. The District has been damaged in an amount yet to be determined as a direct result of the conduct of Defendant MAXIMUS, but believed to be in excess of $3,300,000 for invoicing, and a second amount for other damages that the District sustained as a direct and proximate result of Defendant's knowingly wrongful conduct.

145. The District will continue to be harmed by Defendant MAXIMUS unless and until this Honorable Court grants relief.

COUNT III<br>DISCRIMINATION AGAINST RELATOR UNDER THE FALSE CLAIMS ACT

1-145. Plaintiff repeats and realleges each and every

allegation in paragraphs numbered "1" through "145" of this Complaint with the same force and effect as if fully set forth herein.

146.    Section 3730(h) of the False Claims Act provides relief for any person who has been discharged or discriminated against in any manner by an employer because that employee engaged in protected activity taken in furtherance of a claim under the False Claims Act.  Such activity includes internal corporate complaints of fraud.

147. Specifically, any employee who is discharged, demoted, suspended, threatened, harassed, or in any manner discriminated against in the terms and conditions of payment by his employer because of lawful acts by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in any action filed or to be filed under this section shall be entitled to all relief necessary to make the employee whole.

148.    Such treatment includes reinstatement with the same seniority status, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees. §3730(h), the FCA.

149. Defendant MAXIMUS discriminated against Plaintiff because he reported fraud against the United States Government several times, and because Plaintiff talked to management about the fraud he witnessed or knew about.

150. For example, Defendant MAXIMUS knew that Plaintiff was suffering from severe emotional distress from his unsuccessful attempts to correct the billing mistakes by MAXIMUS. Plaintiff had to take medical leave to recover from the stress. MAXIMUS, with full knowledge that Plaintiff was not to work, caused Plaintiff to work constantly at home for a month before ceasing the calls. When Plaintiff applied for another month's leave because he did not receive leave for the first month, MAXIMUS terminated Plaintiff while Plaintiff was still protected by the Family Medical Leave Act.

151. As a direct and proximate result of the discriminatory acts in violation of § 3730 of the FCA by Defendant MAXIMUS, Plaintiff, after completing his medical leave, has been unable to obtain employment to this date, will also suffer future lost wages, MAXIMUS has irreparably damaged his business reputation. As a direct result of the actions of Defendant MAXIMUS, Plaintiff has suffered loss of employment, including benefits, loss of retirement savings, loss of the value of the wages he was not paid, injury to his business reputation, loss of consortium, great humiliation and embarrassment, depression and other physical ailments requiring treatment, and other tangible and intangible harms.

152. Plaintiff will continue to suffer harms as a result discrimination of Plaintiff by Defendant MAXIMUS until this Honorable Court grants relief.

### COUNT IV

### EMPLOYER INTERFERENCE WITH EMPLOYEE DISCLOSURES

1-152  Plaintiff repeats and re-alleges each and every allegation in paragraphs numbered "1" through "152" of this complaint with the same force and effect as if fully set forth herein.

153.  Section 816 of the DC Act provides for remedies for an employee harmed by his employer by virtue of his act.

154. Section 816(b) of the DC Act provides that no employer shall discharge, demote, suspend, threaten, harass, deny promotion to, or in any other manner discriminate against an employee in the terms and conditions of his employment because of lawful acts done by the employee on behalf of the employee or others in disclosing information to the District Government or law enforcement agency relating to, or in furtherance of, a false claims action, including investigation of, initiation of, or testimony or assistance in an action filed or to be filed pursuant to section 809 of the DC Act.

155.  Under the DC Act, section 816(c) Any employer who violates subsection 816 (b) of the DC Act, shall be liable for the relief necessary to make the employee whole, including reinstatement with the same seniority status that the employee would have had but for the discrimination, two times the amount of back pay, interest on the back pay, compensation for any special damages sustained as a result of the discrimination, and, where appropriate, punitive damages. In addition, the defendant shall be required to pay litigation costs and reasonable attorney fees, necessarily incurred.

156.  Defendant MAXIMUS discriminated against Plaintiff

because he reported fraud against the United States Government
several time, and because Plaintiff talked to management about
the fraud he witnessed or knew about.

157. For example, Defendant MAXIMUS knew that Plaintiff was
suffering from severe emotional distress from his unsuccessful
attempts to correct the billing mistakes by MAXIMUS. Plaintiff
had to take medical leave to recover from the stress. MAXIMUS,
with full knowledge that Plaintiff was not to work, caused
Plaintiff to work constantly at home for a month before ceasing
the calls. When Plaintiff applied for another month's leave
because he did not receive leave for the first month, MAXIMUS
terminated Plaintiff while Plaintiff was still protected by the
Family Medical Leave Act.

158. As a direct and proximate result of the discriminatory
acts in violation of § 3730 of the FCA by Defendant MAXIMUS,
Plaintiff, after completing his medical leave, has been unable to
obtain employment to this date, will also suffer future lost
wages, MAXIMUS has damaged his business reputation. As a direct
result of the actions of Defendant MAXIMUS, Plaintiff has
suffered loss of employment, including benefits, loss of
retirement savings, loss of the value of the wages he was not
paid at today's inflation rate, injury to his business
reputation, loss of consortium, great humiliation and
embarrassment, depression and other physical ailments requiring
treatment, and other tangible and intangible harms.

159. Plaintiff will continue to suffer harms as a result
discrimination of Plaintiff by Defendant MAXIMUS until this

Honorable Court grants relief.

## COUNT V

### DISCRIMINATION BASED UPON DISABILITY

1-159.  Plaintiff repeats and re-alleges each and every allegation in paragraphs numbered "1" through "159" of this complaint with the same force and effect as if fully set forth herein.

160. Plaintiff is an individual with a "disability", or was perceived as suffering from a substantially disabling disability, and has a record of such impairment within the meaning of Section 3(2) of the Americans with Disabilities Act, 42 U.S.C. §12102(2)(a), (b), and (c).

161. More particularly, Plaintiff has a physical impairment that can be perceived as substantially limiting one or more major life activities, has a record of such an impairment, and is regarded by defendant as having such an impairment.

162.  Plaintiff is a "qualified individual with a disability" as that term is defined in §101(8) of the ADA, 42, U.S.C. §12111(8).  More specifically, Plaintiff is an individual with a disability who  can perform the essential functions of her job at this time with reasonable accommodation.

163.  Defendant corporation made no reasonable efforts to ascertain Plaintiff's ability to perform his job with or without accommodation.

164.  Plaintiff suffered humiliation, embarrassment, mental anguish loss of enjoyment of life, and other harms while working for Defendant, and has been deprived of gainful employment

because of Defendant's conduct. Such conduct by Defendant constitutes discrimination against Plaintiff with respect to the terms, conditions, and privileges of employment in violation of Section 102(b)(5)(A) of the ADA, 42 U.S.C. §12112(b)(5)(A), and 42 U.S.C. §12112(a).

165. Defendant corporation has failed to undertake good faith efforts, in consultation with Plaintiff, to make a reasonable accommodation with Plaintiff by accommodating his needs.

166. In failing to make reasonable accommodation for Plaintiff's physical disability, and in terminating Plaintiff, defendant corporation intentionally acted with malice for prospective financial gain or with a reckless disregard or with reckless indifference to the federally protected rights of Plaintiff.

167. As a direct and proximate result of defendant corporation's discrimination on the basis of disability, Plaintiff has suffered lost wages and benefits and lost employment opportunities.

168. Defendant's failure to make reasonable accommodations to Plaintiff has caused, continues to cause, and will cause Plaintiff to suffer substantial damages for pecuniary losses, mental anguish, loss of enjoyment of life, humiliation, embarrassment, severe damage to what was once an excellent work record, damage to his business reputation, and other harms.

169. Plaintiff suffers and will continue to suffer pecuniary and nonpecuniary harms, and will continue to suffer harm unless

and until this honorable court grants relief.

## COUNT VI

### DISCRIMINATION UNDER THE FAMILY MEDICAL LEAVE ACT

1-169.  Plaintiff repeats and re-alleges each and every allegation in paragraphs numbered "1" through "169" of this complaint with the same force and effect as if fully set forth herein.

170.  Under the FMLA, "eligible" employees "shall be entitled" to up to twelve (12) weeks of unpaid leave per year when the employee has "a serious health condition that makes [him or her] unable to perform the functions of [his or her] position. 29 U.S.C. §2612(a)(1)(D).

171. A "serious" health condition is defined as a physical or mental impairment that involves "continuing treatment by a health care provider." 29 U.S.C. §2611(11). The health condition that renders an employee unable to perform his or her job, does not mean a condition that actually incapacitates him or her from work. . Any employee who takes leave, "shall be entitled, on return from such leave-- (A) to be restored by the employer to the [previous position] ... or (B) to be restored to an equivalent position with equivalent employment benefits, and other terms and conditions of employment." 29 U.S.C. §2614(a)(1)((A),(B). It is the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying. 29 C.F.R. §825.208(b)(1)-(c).

172. To establish a _prima facie_ case for a FMLA violation, a Plaintiff must show that (1) he is protected under the FMLA, (2)

he suffered an adverse employment decision, and, either (3) he was treated less favorably than an employee who had not requested FMLA leave or (4) the adverse decision was made because of his request for leave.

173. Plaintiff was granted leave beginning on March 18, 2002. On June 21, 2002, Plaintiff suffered an adverse employment decision -- he was notified that his employment was terminated.

174. During Plaintiff's leave, and until his notice of termination on June 21, 2002, Plaintiff was assured that he could return to his position. Plaintiff's right to FMLA leave was significantly interfered with and restrained by Defendant MAXIMUS. Plaintiff was never given the opportunity to return to work once MAXIMUS decided to deny his request for additional leave.

175. Defendant MAXIMUS' actions are in violation of its own Family and Medical Leave policy. By the above acts, MAXIMUS' termination of Plaintiff is in violation of the FMLA.

176. Plaintiff also claims retaliation under the FMLA. A prima facie case of retaliation requires that (1) an employee engaged in activity protected by the FMLA, (2) the employer thereafter subjected him to adverse action, and, (3) there is a causal connection between the protected activity and the adverse employment action.

177. Plaintiff requested leave, MAXIMUS granted his request, and then he was terminated. This sequence constitutes a termination and denial of his rights under the FMLA and thus comprises an adverse employment action.

178.  Plaintiff suffered humiliation, embarrassment, mental anguish loss of enjoyment of life, and other harms while working for Defendant, and has been deprived of gainful employment because of Defendant's conduct.  Such conduct by Defendant constitutes discrimination against Plaintiff with respect to the terms, conditions, and privileges of employment in violation of the FMLA.

179.  As a direct and proximate result of Defendant's violation of Plaintiff Turner's rights under the Family Medical Leave Act,  Plaintiff has suffered lost wages and benefits and lost employment opportunities, and other harms.

180. Defendant's wrongful conduct in violation of the Family Medical Leave Act has caused, continues to cause, and will cause Plaintiff to suffer substantial damages for pecuniary losses, mental anguish, loss of enjoyment of life, humiliation, embarrassment, severe damage to what was once an impeccable work record, damage to his business reputation, and other harms.

181.  Plaintiff Turner suffers and will continue to suffer pecuniary and nonpecuniary harms.  Plaintiff Turner will continue to suffer harm unless and until this honorable court grants relief.

## DEMANDS

a) That this Court enter a judgment against Defendant, in an amount equal to three (3) times the amount of damages the United States has sustained because of Defendant's actions, an aggregate amount yet to be determined but believed to be approximately $33,000,000, times three;

b) That this Court enter a judgment against Defendant, for a civil penalty of not less than Five Thousand Dollars ($5,000.00) nor more than Ten Thousand Dollars ($10,000.00) up to September 30, 1999, no less the five Thousand Five Hundred Dollars ($5,500.00) after September 30, 1999, for each invoice submitted in violation of 31 U.S.C. § 3729;

c) That this Court enter a judgment against Defendant, in an amount equal to three (3) times the amount of damages the District has sustained because of Defendant's actions, an aggregate amount yet to be determined but believed to be approximately $3,300,000, times three for invoicing false claims at the rate of 10% of the value of such Medicaid claims, and for other harms including the loss of those funds received by mistake and used for other District matters; and in an amount yet to be determined should the United States seek reimbursement for its losses to the Medicaid program;

d) That this Court enter a judgment against Defendant, for a civil penalty of not less than Five Thousand Dollars ($5,000.00) nor more than Ten Thousand Dollars ($10,000.00) for each invoice submitted to the District in violation of Section 814 of the DC Act.

e) That Relator be awarded the maximum recovery allowed under 31 U.S.C. § 3730(d), and in the event the United States proceeds with this action, not less than fifteen percent (15%) and not more than twenty-five percent (25%) of the proceeds of the action or the settlement of the claim; or, in the event the United States does not proceed with this action, not less than

twenty-five percent (25%) and not more than thirty percent (30%) of the proceeds of the action or the settlement of the claim;

f)    That Relator be awarded the maximum recovery allowed under Section 815(f) of the DC Act, and in the event the District proceeds with this action, not less than ten percent (10%) and not more than twenty percent (20%) of the proceeds of the action or the settlement of the claim; or, in the event the District does not proceed with this action, not less than twenty-five percent (25%) and not more than forty percent (40%) of the proceeds of the action or the settlement of the claim;

g) That Relator be awarded all the relief necessary to make the employee whole for discrimination under 31 U.S.C. § 3730(h), including double the amount of back pay, prejudgment and post judgment interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

h) That Relator be awarded all the relief necessary to make the employee whole for discrimination under Section 815(f) of the DC Act, including double the amount of back pay, prejudgment and post judgment interest on the back pay, compensation for any special damages sustained as a result of the discrimination, and punitive damages, including litigation costs and reasonable attorneys' fees.

i) That for violations of the Americans with Disabilities Act, (1)  Find and hold that Plaintiff suffers a disability that is subject to protections under the Americans with Disabilities Act; (2) Find and hold that Defendant's acts of discrimination on

the basis of Plaintiff's disability, namely that he is out of work without pay because of his disability, and that such action is a violation of the ADA; (3) Order that Plaintiff be awarded back pay he would have earned, with related monetary benefits and interest thereon, had he been reinstated to his position at the time of his ability to return to work, such amount to be determined at trial; (4) Award Plaintiff compensatory and punitive damages for discrimination based on Plaintiff's disability in the amount of $300,000; (5) Award Plaintiff front pay in an amount to be determined, including benefits and other employment losses; (6) Enjoin Defendant from any further prohibited discrimination, and order that Defendant provide training for all employees concerning responsibilities under the ADA; (7) Award Plaintiff his attorney fees, including litigation expenses, and the costs of this action for violation of The Americans with Disabilities Act; and (8) Grant such further relief as may be just and proper as a remedy under the Americans with Disabilities Act;

j) that for violations of the Family Medical Leave Act, that this Court (1) Find and hold that Plaintiff was discriminated against under the provisions of the Family Medical Leave Act; (2) Order that Plaintiff be awarded back pay he would have earned, with related monetary benefits and interest thereon, had he been reinstated to his position at the time of his ability to return to work, such amount to be determined at trial; (3) Award Plaintiff compensatory damages for discrimination based on Plaintiff's application for leave under the Family Medical Leave

Act in the amount of $300,000; (4) Award Plaintiff front pay in an amount to be determined, including benefits and other employment losses; (5) Enjoin Defendant from any further prohibited discrimination, and order that Defendant provide training for all employees concerning responsibilities under the FMLA; (6) Award Plaintiff his attorney fees, including litigation expenses, and the costs of this action for violation of The Family Medical Leave Act; and (7) Grant such further relief as may be just and proper as a remedy under the Family Medical Leave Act;

k) That Plaintiff be awarded all costs of this action, and all expenses necessarily incurred, including expert witness fees and other expenses, plus reasonable attorney's fees as provided under the False Claims Act; and

l) That Relator and the United States recover such other relief as this Court deems just and proper.

PURSUANT TO RULE 38 OF THE FEDERAL RULES
OF CIVIL PROCEDURE, PLAINTIFF AND RELATOR DEMAND TRIAL BY JURY

BENJAMIN TURNER,
By Counsel

BY: _____
John Brosnan, Esq.
District of Columbia Bar #424868
10201 Lee Highway
Suite 210
Fairfax, VA 22030
Telephone: (703) 591-6200
Facsimile: (703) 591-6200

CANDACE MC CALL, P.C.
BY: _____
Candace S. McCall, VSB Bar No. 31409
11350 Random Hills Road, Suite 700
Fairfax, Virginia 22030

(703) 385-5251
Counsel for Relator